<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 11-1871**

---

DEERFIELD PLANTATION PHASE II-B PROPERTY OWNERS
ASSOCIATION, INCORPORATED,

        Plaintiff - Appellant,

        v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHARLESTON DISTRICT;
ROBERT L. VAN ANTWERP, Lieutenant General, in his official
capacity as Chief of Engineers, US Army Corps of Engineers;
TREY JORDAN, Lieutenant Colonel, in his official capacity
as District Engineer, US Army Corps of Engineers,
Charleston District; UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY; LISA P. JACKSON, in her official capacity as
Administrator of the US Environmental Protection Agency; A.
STANLEY MEIBURG, in his official capacity as Acting
Regional Administrator, Region IV, US Environmental
Protection Agency; DEERTRACK GOLF, INC.,

        Defendants - Appellees.

---

**No. 11-2253**

---

DEERFIELD PLANTATION PHASE II-B PROPERTY OWNERS
ASSOCIATION, INCORPORATED,

        Plaintiff – Appellee,

        v.

DEERTRACK GOLF, INC.

        Defendant – Appellant,

and

UNITED STATES ARMY CORPS OF ENGINEERS, CHARLESTON DISTRICT; ROBERT L. VAN ANTWERP, in his official capacity as Chief of Engineers, US Army Corps of Engineers; TREY JORDAN, Lieutenant Colonel, in his official capacity as District Engineer, US Army Corps of Engineers, Charleston District; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LISA P. JACKSON, in her official capacity as Administrator of the US Environmental Protection Agency; A. STANLEY MEIBURG, in his official capacity as Acting Regional Administrator, Region IV, US Environmental Protection Agency

Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Florence. R. Bryan Harwell, District Judge. (4:09-cv-01023-RBH)

---

Argued: October 25, 2012                    Decided: December 26, 2012

---

Before MOTZ and KEENAN, Circuit Judges, and James K. BREDAR, United States District Judge for the District of Maryland, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Amy Elizabeth Armstrong, SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT, Pawleys Island, South Carolina, for Deerfield Plantation Phase II-B Property Owners Association, Incorporated. Elizabeth Ann Peterson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees; Mary Duncan Shahid, NEXSEN PRUET, LLC, Charleston, South Carolina, for Deertrack Golf Inc. **ON BRIEF:** Michael G. Corley, SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT, Pawleys Island, South Carolina, for Deerfield Plantation Phase II-B Property Owners Association, Incorporated. Ignacia S. Moreno, Assistant Attorney General, Aaron P. Avila, Jennifer Scheller Neumann, Adam J. Katz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Stephen P. Groves, Sr., NEXSEN PRUET, LLC, Charleston, South Carolina, for Deertrack Golf, Inc.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this appeal, we consider whether the United States Army Corps of Engineers (the Corps) properly determined that it did not have jurisdiction under the Clean Water Act, 33 U.S.C. §§ 1251 through 1387 (the Clean Water Act, or the Act), over certain ponds, ditches, and other waters on a former golf course located in South Carolina. Deerfield Plantation Phase II-B Property Owners Association, Inc. (the Homeowners' Association, or the Association) filed this action against the Corps, the Environmental Protection Agency (the EPA), and Deertrack Golf, Inc. (the Property Owner) (collectively, the defendants), challenging as arbitrary and capricious the Corps' determination that it did not have jurisdiction over such waters. The district court upheld the Corps' decision, and awarded the defendants summary judgment. Upon our review, we affirm the district court's judgment.

I.

This case arises from the planned redevelopment of a parcel of property in Horry County, South Carolina. A now-defunct golf course, known as the "Old South Golf Course," was located on this 152-acre parcel (the Deerfield Tract). In 2005, the Property Owner entered into a contract to sell the Deerfield

Tract to Bill Clark Homes, which in turn planned to redevelop the parcel as a residential subdivision.

The Homeowners' Association is a nonprofit organization whose membership is composed of property owners in Deerfield Plantation, Phase II-B, a residential community developed alongside the old golf course. Thus, the residences, roads, and common areas owned by the Homeowners' Association directly border or are located close to the Deerfield Tract. The Homeowners' Association opposed Bill Clark Homes' proposed redevelopment, alleging that the plan will increase flooding on nearby properties and will result in the destruction of wildlife habitat, diminishing the Association members' use of the land and enjoyment of wildlife.

The Corps is authorized to "issue formal determinations concerning the applicability of the Clean Water Act" to "tracts of land." 33 C.F.R. § 320.1(a)(6). The Corps may decide whether a tract of land is subject to the agency's regulatory jurisdiction under Section 404 of the Clean Water Act. 33 C.F.R. § 331.2.

Section 404 requires, among other things, a permit for the "discharge of dredged or fill material into the navigable waters," which are defined in turn as "waters of the United States." 33 U.S.C. §§ 1344(a), 1362(7). The term, "waters of the United States," includes not only traditional navigable

4

waters, but also other water features that maintain a sufficient connection with "waters of the United States" in their own right, under standards provided by regulations, 33 C.F.R. § 328.3(a), and articulated by the Supreme Court, most recently in Rapanos v. United States, 547 U.S. 715 (2006).

In February 2006, a consultant for Bill Clark Homes filed a request for a jurisdictional determination from the Corps regarding whether any portion of the 152 acres comprising the Deerfield Tract contained "waters of the United States" subject to the Corps' jurisdiction under the Clean Water Act. In August 2006, the Corps issued a jurisdictional determination that the Deerfield Tract did not contain any "waters of the United States" (the initial determination). By its terms, the Corps' initial determination was valid for five years from the date of its issuance.

In March 2010, the Corps issued a revised jurisdictional determination (the revised determination). The revised determination considered whether 85 acres of the Deerfield Tract were subject to the Corps' jurisdiction, because the Property Owner had modified the scope of its request following the Corps' initial determination.

The Corps consulted a variety of sources before it reached a conclusion regarding the waters found on the Deerfield Tract. These sources included: (1) infrared aerial photography;

5

(2) agency records; (3) a Horry County soil survey (Soil Survey); (4) a topographic map for Surfside Beach (Surfside Beach map); and (5) a wetland inventory for Surfside Beach (Wetland Inventory). To resolve conflicts in the evidence, the Corps also conducted two site visits.

In the Soil Survey, the Corps found some evidence of the "potential presence of hydric soils onsite," which "could be an indicator that wetlands or other jurisdictional waters are present on the site." However, given the age of the Soil Survey, this evidence was not considered "conclusive" that hydric soils presently were located on the Deerfield Tract.

The Corps did not find any evidence of wetlands on the Deerfield Tract in the more recent Surfside Beach map or in the Wetland Inventory. Those areas that the Soil Survey had indicated might qualify as wetlands were shown in those two sources as "upland, or dry land." Moreover, on its site visits, the Corps did not find any "relic hydrophytic vegetation that would indicate whether this site historically contained wetlands." Accordingly, the Corps "could not conclusively determine whether the [Deerfield Tract] was ever a wetland."

The Corps ultimately asserted Clean Water Act jurisdiction over only .37 acres of waters on the Deerfield Tract. The bases for this conclusion were as follows. The Corps found that two non-navigable tributaries were "relatively

6

permanent waters," in that they "typically flow year-round or have continuous flow at least seasonally (e.g., typically 3 months)."[1]  The Corps concluded that the two relatively permanent waters each had a firm, sandy bottom with a clearly-defined channel that was free of vegetation, which "demonstrates continuous flow more than seasonally, because vegetation will not have a chance to establish itself due to the water's flow." The Corps also cited evidence of a clearly-defined ordinary high water mark, groundwater influx, and the degree of the curvature (or "sinuosity") of the tributaries, as indicia that they have a "relatively permanent flow."

The Corps noted that the two relatively permanent waters flow out of the Deerfield Tract through a single point of exit, and empty into Dogwood Lake.  The Corps identified Dogwood Lake as "an impounded reach of a relatively permanent water," and thus, a "water of the United States" that flows into the Atlantic Ocean.

---

[1]  The Corps rendered the revised determination based upon the standards articulated in the Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States (Dec. 2, 2008) (the Rapanos Guidance)).  The Rapanos Guidance was jointly prepared by the Corps and the EPA, and it "instructs Corps and EPA personnel on how to make jurisdictional determinations that comply with the new rules for [Clean Water Act] jurisdiction announced by the Supreme Court in Rapanos."  Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs, 633 F.3d 278, 283 (4th Cir. 2011).

7

Roughly one mile separates the two relatively permanent waters on the Deerfield Tract from the Atlantic Ocean. In light of evidence of "continuous" or "perennial flow" and of "a surface connection with the Atlantic Ocean," the Corps found that the .37 acres of waters of the Deerfield Tract constituted non-navigable tributaries of traditional navigable waters, which had a relatively permanent flow of water. Accordingly, the Corps asserted Clean Water Act jurisdiction over these waters.

The Corps did not assert jurisdiction over the remaining waters on the Deerfield Tract, describing them as "a series of ponds that are interconnected by a series of ditches and swales" (collectively, the Contested Waters).[2] Generally, the Corps does not consider swales, ditches, or ponds created to retain water primarily for aesthetic reasons as within its jurisdiction, if such waters are excavated from uplands and do not carry a relatively permanent flow to a traditional navigable water. (citing Rapanos Guidance, at 11-12; Final Rule for Regulatory Programs of the Corps, 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)). The Corps only asserts jurisdiction over "non-navigable, not relatively permanent tributaries" when they have "a significant nexus to traditional navigable water."

_____

[2] A "swale" is a "low tract of land, especially when moist or marshy." The American Heritage Dictionary 1811 (3d ed. 1992).

According to the Corps, the Contested Waters did not meet this standard.

In its reasoning relating to the ditches and swales of the Deerfield Tract, the Corps found that they lacked indicia of relatively continuous flow, because they had no ordinary high water mark, no clear channel without vegetation, no significant channel sinuosity, and no influx of groundwater. The Corps determined that, instead, the ditches and swales "convey water from ponds and surrounding upland areas during and following storm events."

Next, the Corps considered the ponds on the Deerfield Tract, and determined that they were "man-made in uplands," and that there was no evidence of wetlands or other tributaries on the Tract other than the .37 acres identified above. According to the Corps, the ponds were small bodies of water that were constructed primarily for aesthetic reasons associated with the design of a golf course. Significantly, the ponds were connected to the ditches and swales by elevated culverts. Therefore, the Corps found that the ponds were "constructed to maintain a certain water level and would flow only if the pond levels fluctuated above a certain point."

The Corps concluded that individually and collectively, the Contested Waters were characterized by low volume, duration, and frequency of water flow, and did not have

9

a significant nexus with traditional navigable waters of the United States. Accordingly, the Corps declined to assert Clean Water Act jurisdiction over the Contested Waters.

In May 2010, the Homeowners' Association filed an amended complaint in the district court seeking a declaration that the Corps' revised determination was arbitrary and capricious, and was issued in contravention of both the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706, and the Clean Water Act. The Association challenged the Corps' decision to assert jurisdiction over only the .37 acres of "relatively permanent waters," and sought a judgment that all the Contested Waters on the Deerfield Tract qualified as "waters of the United States." The parties filed cross motions for summary judgment.

## II.

The district court began its analysis of this case by discussing the meaning of the phrase, "waters of the United States," as used in the Clean Water Act, 33 U.S.C. § 1362(7), and in the Corps' implementing regulations, 33 C.F.R. § 328(a). <u>Deerfield Plantation Phase II-B Property Owners Ass'n, Inc. v. U.S. Army Corps of Eng'rs</u>, 801 F. Supp. 2d 446, 449-51 (D.S.C. 2011). The district court addressed the two standards articulated by the Supreme Court in <u>Rapanos</u> regarding whether

10

certain water features were "waters of the United States," namely, the standard provided by the four-Justice plurality (the relatively permanent waters standard), and the standard provided by Justice Kennedy in his concurrence (the significant nexus standard). Id. at 451-53.

Under the relatively permanent waters standard, "waters of the United States" include "only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams . . . oceans, rivers, [and] lakes." Rapanos, 547 U.S. at 739 (plurality opinion) (internal quotation marks omitted). The plurality stated that "[e]ven the least substantial of the definition's terms, namely, 'streams,' connotes a continuous flow of water in a permanent channel," and "[n]one of these terms encompasses transitory puddles or ephemeral flows of water." Id. at 733 (plurality opinion). In fact, the plurality wrote that "relatively continuous flow is a necessary condition for qualification as a 'water.'" Id. at 736 n.7 (plurality opinion) (emphasis in original).

By contrast, the significant nexus standard provides that "a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id. at 759 (Kennedy, J., concurring). Justice Kennedy stated that the required nexus for wetlands

11

would be established if "alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 780 (Kennedy, J., concurring). However, when the "wetlands' effects on water quality are speculative or insubstantial," such wetlands "fall outside the zone fairly encompassed by the term 'navigable waters.'" Id. (Kennedy, J., concurring).

The district court concluded that it did not have to address which of the Rapanos tests governed, because the parties agreed that if either test was satisfied, the Contested Waters qualified as "waters of the United States." Deerfield, 801 F. Supp. 2d at 452-53 & n.7. The district court also noted that the Rapanos Guidance provided that "regulatory jurisdiction under the [Clean Water Act] exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied." Id. at 453.

The district court rejected the Homeowners' Association's argument that the Corps relied exclusively on "flow" characteristics and disregarded the presence of "standing" water in the ditches, swales, and ponds that had a connection with the Atlantic Ocean. Deerfield, 801 F. Supp. 2d at 462. The district court observed that "flow" was a factor for the Corps' consideration under the relatively permanent

12

waters standard, because "[e]ven the least substantial of the definition's terms [streams, oceans, lakes, and rivers,] namely, 'streams,' connotes a continuous <u>flow</u> of water in a permanent channel." Id. (quoting Rapanos, 547 U.S. at 733 (plurality opinion)) (emphasis in Deerfield). Indeed, the plurality in Rapanos noted that "relatively continuous <u>flow</u> is a necessary condition for qualification as a 'water.'" Id. (quoting Rapanos, 547 U.S. at 736 n.7 (plurality opinion)) (emphasis in Deerfield).

The district court found persuasive in the present case the Corps' findings that the ditches and swales only contained flowing water after "storm events," and that the ponds were constructed to "maintain a certain water level" and would flow into the ditches and swales only if the water level increased beyond a certain point. Id. at 462-63. Given the evidence that the Contested Waters were characterized by a lack of flow, the district court held that the Corps reasonably concluded that the Contested Waters were not "waters of the United States" under the relatively permanent waters standard. Id. at 463.

The district court also disagreed with the Homeowners' Association's challenge to the Corps' decision regarding the location along the second tributary where the Corps determined that its jurisdiction ended. The court held that the Corps

13

reasonably determined the boundaries of its jurisdiction based on factors that were supported by the record, including differences in vegetation, evidence of groundwater influx, and the presence of an ordinary high water mark.  Id. at 463.

Finally, the district court disagreed with the Homeowners' Association's argument that the Corps' significant nexus analysis was erroneous, as well as arbitrary and capricious.  After the Corps determined that the Contested Waters did not satisfy the relatively permanent waters standard, the Corps further concluded that the significant nexus standard likewise was not satisfied.  The district court held that it was not arbitrary or capricious for the Corps to determine that, based upon "low volume, duration and frequency of water flow," the Contested Waters' ability to affect downstream navigable waters was limited, and did not constitute a significant nexus.  Id. at 464-65.  In sum, the district court found that "the methodology and procedures used by the Corps to arrive at its decision, as well as its findings and conclusions, were reasonable and not arbitrary and capricious."  Id. at 465. Accordingly, the district court awarded summary judgment in favor of the Corps and the EPA.  Id.

The district court denied the Property Owner's motion for costs and attorneys' fees made under 33 U.S.C. § 1365.  Deerfield Plantation Phase II-B Property Owners Ass'n,

14

Inc. v. U.S. Army Corps of Eng'rs, No. 4:09-cv-01023, 2011 WL 4943914 (D.S.C. Oct. 17, 2011). The court declined to find that the Homeowners' Association's claims were "frivolous, unreasonable, or without foundation." Id. at *2-4 (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 415 (1978)). The court noted that the Association initially was successful in obtaining the revised determination from the Corps, and that an environmental expert had provided evidence supporting the claim that the Contested Waters were "waters of the United States."

The Homeowners' Association appeals the district court's award of summary judgment in favor of the defendants. The Property Owner appeals the district court's denial of its request for attorneys' fees and costs.

III.

We review de novo a district court's ruling on a motion for summary judgment. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In conducting our review, we consider the evidence in the light

15

most favorable to the nonmoving party.  Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).

We will set aside a challenged agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In making this assessment, we consider "whether the agency considered the relevant factors and whether a clear error in judgment was made."  Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  Our review of agency action under § 706(2)(A) is deferential.  Id. at 192. Thus, "recognizing the Corps' expertise in administering the [Clean Water Act], we give deference to its interpretation and application" of the two standards articulated in Rapanos for ascertaining "waters of the United States."  See Precon, 633 F.3d at 290.

Initially, we consider the defendants' contention that the Homeowners' Association did not establish the elements of standing, although the Corps raises this argument for the first time on appeal.  See Smith v. Cnty. of Albemarle, 895 F.2d 953, 954 (4th Cir. 1990).  Given the timing of the standing challenge, we will consider additional evidence submitted by the Homeowners' Association on the issue.  See Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170-71 (11th Cir. 2006) (supplemental

16

declarations permitted when standing is first challenged on appeal).

We have reviewed the record, and conclude that the Homeowners' Association demonstrated that the Association, and several of its members individually, have standing to bring the present action. The Association has demonstrated that its members have a factually-supported concern of flooding and of injury to their aesthetic and recreational interests as a result of the proposed redevelopment of the Deerfield Tract. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (stating elements of standing).

With regard to the merits of the Homeowners' Association's action, like the district court, we conclude that the Corps did not err or abuse its discretion in determining that the Contested Waters were not "waters of the United States" under either the relatively permanent waters standard or the significant nexus standard articulated in Rapanos. The Association's argument that the Corps "completely failed to apply the 'significant nexus' standard," is undermined by the plain language of the Corps' revised determination. Our review of the revised determination also leads us to conclude that the Corps did not improperly emphasize the "flow" of the Contested Waters as a factor in its analysis. Rather, we think that the Corps engaged in a careful analysis of numerous permissible

17

factors.  After consulting a multitude of sources and conducting site visits, the Corps reached a well-supported conclusion locating the boundary between the two jurisdictional tributaries on the Deerfield Tract, and the Contested Waters over which the Corps ultimately found that it did not have jurisdiction.

We also hold that the district court did not abuse its discretion in denying the Property Owner's motion for attorneys' fees and costs.  See Johnson v. City of Aiken, 278 F.3d 333, 336 (4th Cir. 2002) (attorneys' fees award reviewed for abuse of discretion).  We credit the reasons given by the district court in reaching its conclusion.  The Association had obtained from the Corps a revised jurisdictional determination, and had presented expert evidence tending to show that portions of the Deerfield Tract contained "waters of the United States." Despite the Property Owner's arguments to the contrary, we discern no abuse of discretion.  Thus, we affirm the district court's award of summary judgment in favor of the defendants for the reasons well stated by the court, and we affirm the court's denial of the Property Owner's request for attorneys' fees and costs.

AFFIRMED

18